Harold LEPEL *v.* ST. VINCENT HEALTH SERVICES
and Preferred Professional Insurance Company

CA 05-1340                                   241 S.W.3d 784

Court of Appeals of Arkansas
Opinion delivered October 25, 2006

*Kaplan, Brewer, Maxey & Haralson, P.A.*, by: *Silas H. Brewer*, for appellant.

*Walter A. Murray*, for appellees.

JOHN B. ROBBINS, Judge. Appellant Harold Lepel sustained a neck injury while working for appellee St. Vincent Health Services on March 11, 2002. The appellee accepted the injury as compensable and covered certain medical and temporary total disability benefits. However, a dispute arose over Mr. Lepel's claim for additional benefits that included medical services provided by Dr. Anthony Russell, TTD benefits from May 22, 2003, through a date yet to be determined, and benefits under Ark. Code Ann. § 11-9-505(a)(1) (Repl. 2002) on account of St. Vincent's alleged refusal to return Mr. Lepel to work within his physical limitations after May 22, 2003. After a hearing, the Workers' Compensation Commission ruled that Mr. Lepel failed to establish entitlement to any of the above additional benefits. Mr. Lepel now appeals, asserting that none of the Commission's findings are supported by substantial evidence. We affirm.

When reviewing a decision from the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm the decision if it is supported by substantial evidence. *Swaim v. Wal-Mart Assoc., Inc.*, 91 Ark. App. 120, 208 S.W.3d 837 (2005). Substantial evidence is that which a reasonable mind might accept as adequate to support

a conclusion. *Id.* Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Davis v. Old Dominion Freight Line, Inc.*, 341 Ark. 751, 20 S.W.3d 326 (2000).

Mr. Lepel testified that he worked for the appellee in the nuclear medicine department. He stated that he was moving a patient in a stretcher on March 11, 2002, when he felt a sharp pain between his neck and right shoulder, as well as pain down to his left elbow. Mr. Lepel first sought treatment at St. Vincent's emergency room on March 18, 2002, where he was prescribed medication and advised to visit his family physician, Dr. Charles Barg.

On May 2, 2002, Dr. Barg ordered an MRI and bone scan, and after reviewing the results he took Mr. Lepel off work for two weeks beginning on May 16, 2002, due to a cervical herniation. Dr. Barg then referred Mr. Lepel to a neurosurgeon, Dr. Wilbur Giles. After an evaluation, Dr. Giles returned Mr. Lepel to work beginning on May 31, 2002, with the restrictions that he not lift more then twenty pounds or engage in pushing or pulling activities. Mr. Lepel continued to work with these restrictions and on October 1, 2002, Dr. Giles returned him to regular duty.

Mr. Lepel continued to experience problems related to his cervical injury and was referred to Dr. Reze Shahim, who first saw him on November 5, 2002. Dr. Shahim recommended a program of physical therapy and pain management, which was administered under the direction of Dr. Gary Frankowski. Dr. Frankowski recommended another MRI, which was conducted on December 20, 2002, and indicated what was described as a questionable tiny ruptured disc on the right at C3-4.

Mr. Lepel testified that he aggravated his injury while working under limitations on April 16, 2003, when a patient was getting out of a chair and grabbed his left arm, causing pain to shoot down the arm. On the following day Dr. Barg advised that Mr. Lepel should remain off work until he visited a neurosurgeon. Mr. Lepel presented to a neurosurgeon, Dr. Anthony Russell, on May 14, 2003, on what Dr. Russell characterized as essentially a self referral. Dr. Russell ordered another MRI that was performed on May 16, 2003, which revealed a cervical fusion predating the compensable injury as well as multilevel degenerative changes. On

May 19, 2003, Dr. Russell noted that Mr. Lepel could return to work with the restrictions that he avoid pushing, pulling, or lifting more than thirty pounds without assistance. Mr. Lepel was on authorized leave from work under the Family Medical Leave Act from April 17, 2003, until returning to work on May 21, 2003.

Mr. Lepel worked on May 21, 2003, and a portion of the following day before being advised that his employment in the nuclear medicine department was being terminated. Mr. Lepel testified that the manager, Kenneth Goad, and radiology director, Dent Smith, met with him on the morning of May 22, 2003. Mr. Smith was the primary spokesman and told Mr. Lepel that due to budget considerations they could not afford to keep his job open. Mr. Smith then advised Mr. Lepel to report to the office of LeRoy Walker, the vice president of human resources.

When Mr. Lepel met with Mr. Walker, he was presented with a "confidential release" form which, among other things, provided that Mr. Lepel would receive a month's salary and health coverage if he would agree to release any potential claims against the hospital. However, Mr. Lepel elected not to sign the agreement. Mr. Lepel acknowledged that, during the meeting, Mr. Walker asked him if he would be interested in other positions with the hospital and advised that there were jobs available. Mr. Walker printed off a list of potential jobs and gave it to Mr. Lepel. However, Mr. Lepel declined to apply for any of the jobs, explaining that "I did not think they intended to hire me in any position since I had already been fired." Mr. Lepel instead accepted his termination and collected his pension fund.

Mr. Smith testified that, at the time Mr. Lepel's position was terminated, he told Mr. Lepel that he was an employee in good standing with the hospital and that he was eligible to apply for anything that he was interested in within the hospital. Mr. Walker testified that the termination agreement presented to Mr. Lepel was a standard form routinely given to terminated employees. Mr. Walker stated that he specifically asked Mr. Lepel to review the job postings and return to discuss what positions he might be interested in, but that Mr. Lepel never came back to discuss any jobs. In this regard, Mr. Walker testified, "I specifically spoke to Mr. Lepel, shared with him a job listing and recall talking to him about not knowing his exact skill sets or interests in other positions, so specifically asked him to look at our posting and come back to me and indicate what positions he might be interested in sliding into."

Mr. Lepel's first argument on appeal is that the Commission erred in refusing to award benefits for the treatment rendered by Dr. Russell on the basis that such treatment was not authorized. Mr. Lepel concedes that he was not referred to Dr. Russell by one of his authorized physicians and that he did not apply for a change of physician pursuant to the applicable rules in Ark. Code Ann. § 11-9-514(a) (Repl. 2002). Subsection (b) of the statute provides, "Treatment of services furnished or prescribed by any physician other than the ones selected according to the foregoing, except emergency treatment, shall be at the claimant's expense." However, Mr. Lepel relies on Ark. Code Ann. § 11-9-514(f) which provides:

(f) When compensability is controverted, subsection (b) of this section shall not apply if:

(1) The employee requests medical assistance in writing prior to seeking the same as a result of an alleged compensable injury;

(2) The employer refuses to refer the employee to a medical provider within forty-eight (48) hours after a written request as provided above;

(3) The alleged injury is later found to be a compensable injury; and

(4) The employer has not made a previous offer of medical treatment.

Mr. Lepel maintains that subsection (f) applies because the appellee controverted further medical benefits, and that a written request for medical assistance was executed and denied. While Mr. Lepel did not himself make any written request, he relies on the April 9, 2003, independent medical evaluation of Dr. Ronald Williams, where Dr. Williams reported that the previous MRI findings were equivocal and that "I would like to repeat that."

■ We hold that the Commission properly denied compensation for the treatment by Dr. Russell. Contrary to Mr. Lepel's argument, the provisions of Ark. Code Ann. § 11-9-514(f) were not met in this case. The report by Dr. Williams did not constitute a written request by the employee for an MRI or treatment under the meaning of the statute. Moreover, compens-

ability of Mr. Lepel's neck injury was not controverted by the appellee, and a previous offer of medical treatment was made by the appellee and accepted by Mr. Lepel. Mr. Lepel's authorized physician was Dr. Barg, who had made previous referrals to neurosurgeons Giles and Shahim. While Dr. Barg noted on April 17, 2003, that Mr. Lepel should remain off work until he sees a neurosurgeon, this did not constitute a referral to any specific physician, including Dr. Russell. Mr. Lepel did not apply for a change in physician and elected to visit Dr. Russell on a self referral, and we agree that the resulting treatment was unauthorized.

We next address Mr. Lepel's argument that the Commission erroneously denied his claim for benefits under Ark. Code Ann. § 11-9-505(a) (Repl. 2002), which provides:

> (a)(1) Any employer who without reasonable cause refuses to return an employee who is injured in the course of employment to work, where suitable employment is available within the employee's physical and mental limitations, upon order of the Workers' Compensation Commission, and in addition to other benefits, shall be liable to pay to the employee the difference between benefits received and the average weekly wages lost during the period of the refusal, for a period not exceeding one (1) year.

> (2) In determining the availability of employment, the continuance in business of the employer shall be considered, and any written rules promulgated by the employer with respect to seniority or the provisions of any collective bargaining agreement with respect to seniority shall control.

Mr. Lepel contends that because the appellee terminated him and unreasonably failed to return him to suitable work within his limitations, the above provision applies.

In making his argument, Mr. Lepel relies on *Torrey v. City of Fort Smith*, 55 Ark. App. 226, 934 S.W.3d 237 (1996), where we held:

> Before Ark. Code Ann. § 11-9-505(a) applies several requirements must be met. The employee must prove by a preponderance of the evidence that he sustained a compensable injury; that suitable employment which is within his physical and mental limitations is available with the employer; that the employer has refused to return

him to work; and, that the employer's refusal to return him to work is without reasonable cause.

*Id.* at 230, 934 S.W.2d at 239. In that case, we further held that the statute requires that, when an employee who has suffered a compensable injury attempts to re-enter the work force, the employer must attempt to facilitate the re-entry by offering additional training to the employee, if needed, and reclassification of positions, if necessary. Mr. Lepel asserts that Mr. Walker nor any of the appellee's employees attempted to assess his job skills or assist in any training. While Mr. Lepel was given a list of potential jobs, he maintains that he was understandably skeptical about applying for any of the positions given that he had just been terminated by his employer.

■ We hold that substantial evidence supports the Commission's decision that Mr. Lepel failed to establish entitlement to benefits under Ark. Code Ann. § 11-9-505(a)(1). We think it significant that appellee returned Mr. Lepel to work following his March 11, 2002 compensable injury and that Mr. Lepel worked all but two weeks over the next thirteen months until he absented himself under the Family Medical Leave Act on April 16, 2003.[1] Furthermore, in *Torrey v. City of Fort Smith, supra,* we held that the claimant was entitled to such benefits where, after being advised by his employer that there were no jobs within his physical restrictions, the claimant was encouraged to apply for other positions within the city and he applied for two dispatcher positions but was not hired. To the contrary, as found by the Commission in the instant case, Mr. Lepel was offered but failed to take advantage of the opportunity to apply for other positions. Because Mr. Lepel was provided assistance by Mr. Walker in obtaining alternate employment that may have been within his restrictions, but declined to apply for any other jobs, we cannot say that the appellee refused to return him to work. And while Mr. Lepel testified that he elected not to apply for any jobs because he thought it would be useless, this is belied by his stipulation below that his termination had nothing to do with his workers' compensation claim, as well as the evidence that the elimination of his

---

[1] The five weeks that Mr. Lepel was on medical leave between April 16, 2003, and May 21, 2003 are not in issue on this appeal. Mr. Lepel does not claim entitlement to temporary total disability during this period and the Commission has made no ruling on whether this time off was precipitated by a compensable injury.

position was purely a financial decision as opposed to one based on any misconduct or personal animosity.

■ Mr. Lepel's remaining argument is that the Commission erred in failing to award temporary total disability benefits beginning from the date of his termination. We disagree. Temporary total disability is that period within the healing period in which an employee suffers a total incapacity to earn wages. *K II Constr. Co. v. Crabtree*, 78 Ark. App. 222, 79 S.W.3d 414 (2002). The evidence in this case demonstrated that when his position was terminated Mr. Lepel was capable of working in some capacity, and in fact had been working for the appellee for an extended period of time following the compensable injury. While Mr. Lepel contends that the appellee thereafter failed to provide any other job within his restrictions, we reiterate that Mr. Lepel failed to apply for any jobs as encouraged by Mr. Walker. Moreover, there was testimony by Mr. Lepel that he frequently climbed Pinnacle Mountain, and climbed it two to three times per week even during the period he was off work for medical reasons immediately before his position was eliminated. He also testified that he intends to go back to work. Given these circumstances, there was substantial evidence to support a finding that Mr. Lepel was not totally incapacitated from earning wages.

Affirmed.

PITTMAN, C.J., GLADWIN, BIRD, CRABTREE, and BAKER, JJ., agree.

GRIFFEN, GLOVER, and ROAF, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. I agree that appellant was not entitled to benefits for medical services provided by Dr. Russell. I, however, dissent from the majority's view that the Commission properly denied appellant's claim for benefits under Ark. Code Ann. § 11-9-505(a)(1) (Repl. 2002).

Arkansas Code Annotated section 11-9-505(a)(1) provides:

> Any employer who without reasonable cause refuses to return an employee who is injured in the course of employment to work, where suitable employment is available within the employee's physical and mental limitations, upon order of the Workers' Compensation Commission, and in addition to other benefits, shall be

liable to pay to the employee the difference between benefits received and the average weekly wages lost during the period of the refusal, for a period not exceeding one (1) year.

The purpose of § 11-9-505 "is to place an emphasis on returning the injured worker to work, while still allowing and providing for vocational rehabilitation programs when determined appropriate by the commission." Ark. Code Ann. § 11-9-505(d). Before this section applies, a claimant must prove by a preponderance of the evidence that he sustained a compensable injury; that suitable employment within his physical limitations is available with the employer; that the employer has refused to return him to work; and that the employer's refusal to return him to work is without reasonable cause. *Torrey v. City of Ft. Smith*, 55 Ark. App. 226, 934 S.W.2d 237 (1996).

In *Torrey*, the injured employee was terminated after learning that the City of Fort Smith had no positions available that would accommodate the restrictions placed on his work activities. He was encouraged to apply for other positions with the City and was afforded the opportunity to interview for other positions, but he was not rehired by the City. While the Commission denied benefits in light of the City's position that it did not hire the injured employee because there were others more qualified for the position, this court reversed and remanded for an award of benefits. We stated:

> At a minimum Ark. Code Ann. § 11-9-505(a) requires that when an employee who has suffered a compensable injury attempts to re-enter the work force the employer must attempt to facilitate the re-entry into the work force by offering additional training to the employee, if needed, and reclassification of positions, if necessary.

*Id.* at 231, 934 S.W.2d at 239-40.

The record in this case demonstrates a glaring failure by the employer to comply with either the terms or the spirit of the statute based on what we said in *Torrey*. Rather, St. Vincent terminated the appellant one day after he returned to work from having been on Family and Medical Leave because, according to its witnesses, the employer could not afford to maintain the nuclear medicine department where he worked. Appellant was not transferred to a different department. He was not offered employment elsewhere within St. Vincent. There is no evidence that St.

Vincent made any effort to determine what job openings, if any, matched appellant's twenty-pound lifting restriction. Rather, the evidence shows that St. Vincent terminated appellant, tried to get him to sign an agreement that called his severance a voluntary resignation, and did so intending to extinguish appellant's right to any further benefits (presumably including workers' compensation benefits).

After discharging appellant, St. Vincent attempted to induce him to sign a document titled "Confidential Release" which, by its terms, was intended to forever release St. Vincent "from any and all possible liability" in exchange for one month's base salary. The document that St. Vincent presented appellant misstated the fact of his termination and the circumstances surrounding its tender, as is readily discerned from the following numbered provisions of that document:

> 1. By executing this Confidential Release, Employee confirms that they [sic] voluntarily and irrevocably resign their [sic] employment with St. Vincent effective May 22, 2003, and they [sic] agree that their [sic] employment with St. Vincent will be forever terminated under the terms and conditions of this Confidential Release.
>
> . . . .
>
> 11. Employee expressly warrants, acknowledges and represents that: (a) They [sic] have been advised by St. Vincent that they [sic] may wish to consult with an attorney prior to executing this Confidential Release; (b) They [sic] have been afforded an opportunity to consider this Confidential Release for a period of twenty-one (21) days; . . .
>
> 12. Employee shall have a period of seven (7) days following their execution of the Confidential Release to revoke it, if they [sic] so choose, and this Confidential Release shall not be effective or enforceable prior to the expiration of that period. In the event the Employee exercises their [sic] right to revoke this Confidential Release, St. Vincent shall immediately and automatically be relieved of any responsibility to provide the considerations set forth in paragraph 2 of this Confidential Release [calling for payment of salary for one month].

Contrary to the language of the document that St. Vincent presented to appellant, he was discharged from its employ. He did not resign and had not sought to resign. Dent Smith informed

appellant that his employment was terminated. LeRoy Walker tried to entice appellant to sign the release and term his separation a "voluntary resignation." There is no evidence in the record that Smith, Walker, or anyone else informed appellant that he could resign his employment or that appellant sought to resign it. Furthermore, there is no proof that St. Vincent presented the release to appellant twenty-one days earlier or that anyone at St. Vincent had even discussed his possible separation from the employment before Smith informed appellant that his employment was terminated.

Although the majority may disregard or minimize the significance of these uncontroverted facts, these facts directly bear on the employer's responsibility under § 11-9-505(a). Before the Commission determined whether the employer fulfilled its statutory responsibility, it should have analyzed the record in light of what the employer did and what it did not do. After all, § 11-9-505 obligates employers to engage in affirmative efforts aimed at returning injured workers to the workplace. Our decision in *Torrey* made that obligation unmistakably clear.

Implicit in § 11-9-505(a) and our interpretation of that section in *Torrey* is an expectation of a good-faith effort to facilitate an injured employee's re-entry into the workforce where suitable employment is available. That good faith is conspicuously absent in this case. First, Smith and manager Ken Goad terminated appellant before they sent him to the human resources office. Second, they did not refer him to the human resources office for reassignment; rather, they sent him there to secure a release of claims against St. Vincent. Third, Walker did not offer the list of 300 "available" openings until *after* he attempted to secure a release and *after* he and appellant had further discussion about jobs within the St. Vincent system. Fourth, when Walker presented appellant with the list of openings, Walker did not discuss whether appellant would be hired for any of those jobs; nor did he indicate whether any of the positions met the twenty-pound lifting restriction appellant had been given.

The post-termination actions taken by St. Vincent were inconsistent with the conclusion that it acted in compliance with § 11-9-505(a). Although the Commission concluded that appellant made no effort to pursue any of these opportunities, the workers' compensation act, and particularly § 11-9-505, places the onus of facilitating an injured worker's re-entry into the workplace on the employer, not the employee. St. Vincent, which terminated

appellant's employment, should not be allowed to skirt its statutory obligation to facilitate appellant's return to the workforce by relying on appellant's reasonable belief that he would not be re-employed after its managers told appellant that he had been discharged. Further, an employer cannot meet its obligation by terminating an employee and by merely providing a list of jobs. That action merely places an injured employee back into a hiring pool of unemployed job applicants.

The majority also appears to be impressed by the stipulation that appellant's position was eliminated purely for financial reasons and had nothing to do with any animosity toward appellant. However, in *Torrey*, we rejected the employer's contention that it did not rehire the claimant there because others were more qualified to fill the positions for which the claimant applied. Again, the employer still has a statutory obligation to facilitate the re-entry into the workforce.

Section 11-9-505 is designed to ensure that injured workers are returned to the workforce. Regardless of St. Vincent's motives, it failed to facilitate appellant's re-entry into the work force. Because the majority has decided that appellant is not entitled to benefits despite St. Vincent's failure to facilitate appellant's return to the workforce, I must respectfully dissent.

I am authorized to state that Judges GLOVER and ROAF join in this opinion.